J-S51001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: O.R.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: J.A.L., FATHER | |
| | No. 844 EDA 2017 |

Appeal from the Judgment  February 3, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-AO185

| | |
|---|---|
| IN RE: ADOPTION OF: K.N.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: J.A.L., FATHER | |
| | No. 846 EDA 2017 |

Appeal from the Order Dated February 3, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-AO184

| | |
|---|---|
| IN RE: ADOPTION OF: A.H.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: J.A.L., FATHER | |
| | No. 853 EDA 2017 |

*  Former Justice specially assigned to the Superior Court.

J-S51001-17

Appeal from the Order Dated February 3, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-AO183

| | |
|---|---|
| IN RE: ADOPTION OF: H.D.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: J.A.L., FATHER | No. 862 EDA 2017 |

Appeal from the Order Dated February 3, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-AO182

BEFORE: BOWES, J., SHOGAN, J., AND STEVENS, P.J.E.,*

MEMORANDUM BY BOWES, J.:                    **FILED SEPTEMBER 20, 2017**

J.A.L. ("Father") appeals from the orphans' court order terminating his parental rights to his four children, K.N.L. (born September 2004), O.R.L. (born April 2008), A.H.L. (born January 2010), and H.D.L. (born October 2013) pursuant to 23 Pa.C.S. § 2511(a) and (b). We affirm.

All four children were born of Father's relationship with C.G ("Mother").[1] Both parents have debilitating drug addictions that required the

_____

[1] On the same date, the orphans' court terminated the parental rights of C.G. ("Mother") to all four children. Both parents filed timely notices of appeal, but due to Father's delays in filing the required docketing statements
*(Footnote Continued Next Page)*

- 2 -

intervention of Montgomery County Office of Children and Youth ("OCY") as early as 2012. The children were initially adjudicated dependent between December 2012 and May 4, 2014, due to Mother and Father's substance abuse and criminal activity. The cases were closed on June 2014. However, on September 22, 2015, the juvenile court reopened the cases and ordered Mother and Father to comply with OCY, to utilize ongoing services, and submit random drug screens.

On October 30, 2015, police went to arrest Mother at the family home, and discovered a woman in the home who had overdosed. In addition, it was evident that the family had been living in squalor. The residence was in deplorable condition, and the odor of natural gas drifted through the home. Authorities from the police and fire departments deemed the residence uninhabitable and sealed it. The two youngest children, A.H.L. and H.D.L., were present in the home during the episode.

All four children were placed into protective custody, and the juvenile court adjudicated them dependent eleven days later. The court awarded legal custody and physical custody to OCY, who placed the four children together with Foster Parents, a pre-adoptive resource. The initial permanency goal was reunification, with a concurrent goal of adoption. The

_(Footnote Continued)_ ───────────────

with this Court, Mother's appeals were assigned to an earlier panel, which affirmed the order terminating her parental rights. ***In re: Adoption of H.D.L.***, 2017 WL 3131197 (Pa.Super. filed on July 24, 2017).

juvenile court granted Father weekly supervised visitation for a duration of one hour.

Pursuant to OCY's family service plan ("FSP"), Father was required to maintain suitable housing, complete parenting class, abstain from drugs and alcohol, address mental health concerns, refrain from criminal activities, complete anger management, and cooperate with OCY and its service providers. Father's compliance was minimal. While Father attended the nine supervised visitations that he received with the children at the Montgomery County jail, he attended only four of the eight visitations that were scheduled during the periodic gaps in his incarceration. Father was chronically noncompliant with both OCY's directives and the conditions of his probation. In January 2016, Father was arrested for a probation violation after he ingested marijuana. He was jailed for the violation and remained incarcerated until June 2016. He violated probation again in August 2016, after he failed to complete drug treatment, persisted in abusing drugs, and incurred a new criminal charge for retail theft. Father also admitted to his probation officer that he continued to consume alcohol and that he used heroin three to four times per week. He was re-incarcerated, and he remained in jail when the evidentiary hearing commenced before the orphans' court on February 1, 2017.

Meanwhile, on November 14, 2016, OCY filed petitions to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2),

(8) and (b). Following an evidentiary hearing, the orphans' court terminated Father's parental rights pursuant to § 2511(a)(2), (8), and (b).[2] These timely appeals ensued.[3] Father complied with Pa.R.A.P. 1925(a)(2)(i) by concurrently filing concise statements of errors complained of on appeal.

Father presents one broad question for our review:

Did the Montgomery County Office of Children and Youth fail to present clear and convincing evidence sufficient to justify the Trial Court's conclusion that the needs and welfare of the children would be best served by terminating [Father's] parental rights?

Father's brief at 4.

_____

[2] We are cognizant of our Supreme Court's recent decision in *In Re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017), wherein the majority of the justices held 23 Pa.C.S. § 2313(a) required that counsel be appointed to represent the legal interests of any child involved in a contested involuntarily termination proceeding. The High Court recognized, however, that Part II–B of the opinion was not precedential and did not overrule our holding in *In re K.M.*, 53 A.3d 781 (Pa.Super. 2012), insofar as a guardian *ad litem* who is an attorney may act as counsel so long as the dual roles do not create a conflict between the child's best interest, which is determined by the trial court, and the child's legal interest, which the High Court defined as synonymous with the his or her preferred outcome.

Instantly, the children's guardian *ad litem* supported the termination of Father's parental rights as serving the children's best interests. Our review of the record does not reveal any conflict between this positon and the children's legal interests as neither K.N.L., O.R.L., A.H.L., nor H.D.L. opposed the involuntary termination of Father's parental rights.

[3] We consolidated the appeals *sua sponte*.

The pertinent scope and standard of review of an order terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re M.M.*, 106 A.3d 114, 117 (Pa.Super. 2014) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa.Super. 2005)). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of T.M.T.*, 64 A.3d 1119, 1124 (Pa.Super. 2013).

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re R.N.J.*, 985 A.2d 273, 276. The trial court is free to make all credibility determinations, and may believe all, part, or none of the evidence presented. *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004). If the findings of the trial court are supported by competent evidence, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003).

*Id*.

As noted, the orphans' court terminated Father's parental rights pursuant to § 2511(a)(2), (8) and (b). We need only agree with the orphans' court's decision as to one subsection of 23 Pa.C.S. § 2511(a), and §

- 6 -

2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 02004) (*en banc*). Herein, we agree with the orphans' court's decision to terminate Father's parental rights pursuant to subsection 2511(a)(8) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8) and (b).

In order to satisfy the requirements of § 2511(a)(8) in the case at bar, OCY was required to produce clear and convincing evidence that: (1) K.N.L., O.R.L., A.H.L., and H.D.L. have been removed from Father for at least

twelve months; (2) the conditions which led to the children's removal continue to exist; and (3) involuntary termination of parental rights would best serve the children's needs and welfare. *See In Re Adoption of M.E.P.,* 825 A.2d 1266, 1275–1276 (Pa.Super. 2003). "Notably, termination under Section 2511(a)(8), does **not** require an evaluation of [Father's] willingness or ability to remedy the conditions that led to placement of [his] children." *In re Adoption of R.J.S.,* 901 A.2d 502, 511 (Pa.Super. 2006) (emphasis in original).

Presently, the four children have been in OCY's care since October 30, 2015, due to, *inter alia*, concerns about Father's drug and alcohol abuse, criminal activity, and the family's deplorable living conditions. Since OCY did not file its petition to terminate Father's parental rights until November 14, 2016, approximately twelve and one-half months later, the agency satisfied the threshold requirement of § 2511(a)(8). Next, we address whether the substance abuse, neglect, and criminal activity that led to the children's removal continue to exist.

The lack of clarity in Father's statement of the questions presented carries through to his legal argument. Father does not assail any specific components of the orphans' court's determination as to §2511(a)(8). Instead, Father proffers a brief, almost prose-like, homily on the evils of the recent drug pandemic, generally, and his personal battles with addiction specifically. War stories aside, the only legal arguments that can be gleaned

from Father's flowery rhetoric are two related assertions: 1) "the record does not contain any testimony or evidence from which an inference of physical abuse [nutritional malfeasance, or educational neglect] of the children can be reasonably inferred[;]" and 2) "The record demonstrates forgetfulness, irresponsibility, and selfishness, but it certainly does not demonstrate the kind of virulent, abusive conduct . . . from which a settled purpose of abandonment can reasonably be inferred." Father's brief at 8, 9-10.

Notwithstanding Father's protestations to the contrary, OCY was not required to proffer evidence of virulent abuse or malfeasance to sustain its burden of proof, and more importantly, the certified record confirms that OCY did, in fact, adduce clear and convincing evidence to establish the statutory grounds to terminate Father's parental rights pursuant to 2511(a)(8), a provision that implicates neither the abusive conduct nor abandonment that Father argues is lacking herein. Accordingly, Father's present position is irrelevant to the question of whether his parental rights were properly terminated.

During the evidentiary hearing, Jennifer Hall, Father's probation officer since January 2016, testified about his excessive history of substance abuse and criminal activity. *See* N.T., 2/1/17, at 60-65. She also noted that Father has made no effort to address his substance abuse. During January 2016, Father admitted to using heroin, alcohol, and benzodiazepines. *Id*. at

63. As recently as August 2016, three months before OCY filed its petition to terminate parental rights, Father indicated that he was abusing heroin and alcohol roughly four times per week. *Id*. at 63. He has never participated in drug treatment on a consistent basis or completed treatment. *Id*. at 63-64. Father was not scheduled to be released from commitment until April 2017, and Ms. Hall recommended that he be admitted into an inpatient treatment program or a half-way house prior to release. *Id*. at 64-65.

As Father was incarcerated for eleven of the fifteen months that the children have been in placement since the October 2015 episode, his relationship with the children is fragile. *Id*. at 170 He attended only four of eight supervised visitations outside of jail. *Id*. Similarly, Father contacted the children by telephone only periodically. *Id*. His compliance with the remaining goals FSP goals relating to substance abuse, mental health treatment, parenting education, and employment were all inconsistent. *Id*. at 169. Indeed, as it relates to the employment and housing components of the FSP, Father testified during the hearing that he does not have steady employment or suitable housing arranged for the children when he finally is released from supervision. N.T., 2/2/17, at 46. Instead, he anticipates living in a recovery home for several months. *Id*.

The foregoing evidence sustains the orphans' court's determination that OCY proved by clear and convincing evidence the statutory grounds to

terminate Father's parental rights to K.N.L., O.R.L., A.H.L., and H.D.L. pursuant to § 2511(a)(8). The children were removed from the household for more than twelve months due to all the issues that flowed from Mother and Father's addiction, including Mother's incarceration and Father's criminal activity and inability to maintain appropriate employment and housing for the children. The conditions that led to the children's removal continue to persist, and termination would best suit the children's needs and welfare in relation to Father's weaknesses.

Although Father's brief highlights his new-found commitment to "find steady employment, . . . secure a decent place to live, [and comply with] whatever [OCY] is asking me to do with visitation and counseling service[,]" the fact remains that for the fifteen months between OCY's most recent involvement with the family and the evidentiary hearings, Father refused to satisfy the obligations that he is now presumably committed to performing in the future. Father's brief at 10. While Father's intentions are commendable, they are irrelevant insofar as the orphans' court was not required to examine Father's willingness to rectify his deficiencies at this late juncture. *See In re Adoption of R.J.S.*, *supra* at 511, ("Section 2511(a)(8), does **not** require an evaluation of [Father's] willingness or ability to remedy the conditions that led to placement[.]") (emphasis in original).

More importantly, the lives of K.N.L., O.R.L., A.H.L., and H.D.L. "simply cannot be put on hold in the hope that [Father] will summon the

ability to handle the responsibilities of parenting." *In re J.T. and R.T.*, 817 A.2d 505 (Pa.Super. 2003). This principle is particularly applicable where, as here, OCY has been engaged with the family since 2012 and the identical issues with substance abuse and criminal activity continue to persist.

Having found that the certified record supports the orphans' court's finding that OCY established the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(8), we next address the court's needs and welfare analysis pursuant to 2511(b). While Father does not challenge the orphans' court's analysis explicitly, we review it in an abundance of caution to ensure that the termination of Father's parental rights will serve the children's developmental, physical and emotional needs and welfare.

With respect to § 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010). Neither the Adoption Act nor authoritative precedent requires the orphans' court to enlist a formal bonding evaluation, and the court's needs and welfare analysis need not hinge upon expert testimony. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2011).

> In relation to §2511(b), the orphans' court provided as follows:
>
> I conclude that the emotional needs and welfare of the children can best be met by termination of the parental rights of both Parents, and that the children will not suffer a detriment as a result of termination of the parental rights of both Parents.
>
> In this case I find that the parental bond between Birth Mother and each child is minimal. I also find that the parental bond between the Birth Father and each child is minimal. By contrast I find that the bond has developed between the foster parents and the children that has been described as warm and nurturing from the testimony of the caseworker.
>
> Therefore, I find from the evidence and testimony that termination of Birth Mother and Birth Father's rights best serves the needs and the welfare of each of these children, and termination of the parental rights of Birth Mother and Birth Father will not irrevocably harm any of the children.

N.T., 2/2/17, at 147.

The certified record sustains the orphans' court's determination. Joan Dolan, the OCY caseworker who is currently assigned to the family, testified that terminating Father's parental rights in order to facilitate adoption by the Foster Parents is in the best interest of all four children. N.T., 2/1/17, at 171, 175. The three oldest children, K.N.L., O.R.L. and A.H.L., were in placement a total of thirty months as of the date of the termination

proceedings. *Id*. at 177. The youngest child, then three-year-old H.D.L., was in placement for seventeen months. *Id*.

As it relates to the parent-child bond, Ms. Dolan described Father's relationship with the children as a "very casual" connection. *Id*. at 171. She explained that, during the supervised visitations, the children do not interact with Father and they are not disappointed when the visitations end. *Id*. Ms. Dolan testified that the children would not suffer any detriment if Father's parental rights were terminated. *Id*. She expounded, "they expressed fear [and] witnessed domestic violence in the [family] home. They don't have the connection with [Father]. As I said, it's more of a causal connection." *Id*. In sum, she opined that Father is closer to a "playmate" then a parent. *Id*.

In contrast to the meager relationship that the children have with Father, they each maintain significant bonds with Foster Parents. Ms. Dolan described how the children feel secure in the foster home, which she characterized as a "stable, healthy, and secure environment." *Id*. at 174. As a result of Mother and Father's parenting, all four children require some type of service. K.N.L receives therapy for post-traumatic stress disorder, H.D.L. hoards food and restricts his bowel movements, and A.H.L. and O.R.L. both receive therapy for different behavioral concerns. *Id*. at 172, 175. Despite their unpleasant history with Mother and Father, the children are currently thriving academically and socially. *Id*. Ms. Dolan stressed

that, unlike Mother and Father, Foster Parents place the children's needs before their own, and for the first time in their short lives, K.N.L., O.R.L., A.H.L., and H.D.L. are allowed to behave like typical children. ***Id***. at 176.

As demonstrated by the foregoing evidence, the orphans' court properly considered the children's existing relationships with Father, as well as the obvious parent-child bond they share with Foster Parents, and the importance of nurturing those beneficial relationships. ***See Adoption of C.J.P.***, 114 A.3d 1046, 1054 (Pa.Super. 2015) ("In addition to a bond examination, the trial court . . . should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent [and] the importance of continuity of [those] relationships[.]").

As the record sustains the orphans' court's conclusion that terminating Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of K.N.L., O.R.L., A.H.L., and H.D.L., we will not disturb it.

Orders affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/20/2017

- 15 -